UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
WESTERN DIVISION



SOUTHERN DISTRICT OF MISSISSIPPI
FILED

JUL - 3 2017

BY _____ ARTHUR JOHNSTON DEPUTY

| | | |
|---|---|---|
| RICHLAND EQUIPMENT COMPANY, INC., a Mississippi Corporation, | ) ) ) | CASE NO. 5:17-cv-88 DCB-MTP |
| Plaintiff, | ) ) ) | |
| v. | ) ) | VERIFIED COMPLAINT |
| | ) | JURY TRIAL DEMANDED |
| DEERE & COMPANY, a Delaware Corporation, | ) ) ) | INJUNCTIVE RELIEF REQUESTED |
| Defendant. | ) | |

**COMPLAINT**

Plaintiff Richland Equipment Company, Inc. ("Richland"), for its Complaint against Defendant Deere & Company ("Deere"), states and alleges as follows:

I. **INTRODUCTION**

1. Richland brings this action as a result of Deere's unilateral decision to terminate Richland as a dealer for Deere's products in Mississippi. Deere has purported to terminate Richland effective August 2, 2017, without proper notice, without good cause, and without any opportunity to cure any purported deficiencies in Richland's performance. In doing so, Deere has violated Mississippi Code Section 75-77-2. As a result of this unlawful notice of termination, Richland is entitled to injunctive relief and, in the alternative, damages sustained, as well as costs and attorneys' fees, under Mississippi Code Section 75-77-16.

2. In addition to terminating Richland in violation of the Mississippi Code, Deere breached the parties' Agricultural Equipment Dealer Agreement, their Consumer Products Dealer Agreement, their Commercial Worksite Products Dealer Agreement, and the implied covenant of

good faith and fair dealing by terminating Richland in a bad faith, discriminatory, and commercially unreasonable manner.

3. Deere has also violated the Robinson-Patman Act, the Sherman Antitrust Act, and the Mississippi Antitrust Law, by giving favored competitors preferential pricing and allowances. These actions have directly resulted in real harm to Richland's business, through the loss of sales, the loss of customers, and the loss of the trust and goodwill of its customers. As a result of these violations, Richland is entitled to injunctive relief, in addition to treble damages, costs and attorneys' fees.

4. Richland reasonably

II.   **PARTIES**

5. Richland is a Mississippi corporation with its principal place of business at MS Highway 33 South, Centreville, Mississippi.

6. Deere is a Delaware corporation with its principal place of business in Moline, Illinois.

7. Richland and John Deere Company, a division of Deere, are the parties to the Agricultural Equipment Dealer Agreement.

8. Richland and John Deere Company, a division of Deere, are the parties to the Consumer Products Dealer Agreement.

9. Richland; John Deere Commercial Worksite Products, Inc., a division of Deere; and John Deere Company, a division of Deere, are the parties to the Commercial Worksite Products Dealer Agreement

III.   **JURISDICTION**

10. Diversity jurisdiction exists over this controversy pursuant to 28 U.S.C. § 1332. Richland is a Mississippi corporation with its principal place of business in Mississippi, while Deere is a

Delaware corporation with its corporate headquarters in Illinois. Further, the amount in controversy is reasonably believed to exceed $75,000, exclusive of interest and costs.

11. This court has personal jurisdiction over Deere because Deere has regularly engaged in interstate commerce throughout the Unified States, including Mississippi.

12. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a), as a substantial part of the events or omissions giving rise to Richland's claims occurred in this district, and a substantial part of the property that is the subject of the claims is situated in this district.

IV.     **BACKGROUND FACTS**

13. The relationship between the parties began when Richland became a Deere dealer in 1976.

14. Richland and Deere currently have three dealer agreements: (1) the John Deere Agricultural Dealer Agreement ("Ag DA") entered into by the parties in 1986 (attached as Exhibit 1); (2) the John Deere Consumer Products Dealer Agreement ("CP DA") entered into by the parties in 1986 (attached as Exhibit 2); and (3) the John Deere Commercial Worksite Products Dealer Agreement ("CWP DA") entered into by the parties in 2001 (attached as Exhibit 3) (collectively "Dealer Agreements").

15. Each of the Dealer Agreements appoints Richland as an authorized dealer for the products encompassed by that agreement.

16. The three Dealer Agreements vary on the territories for which Richland is responsible. The CP DA is silent as to Richland's Area of Responsibility ("AOR"). Richland's AOR in the Ag DA is "the town in which his place of business is located and vicinity." (See Ex. I at p. 2.) Richland's AOR in the CWP DA (termed Area of Primary Responsibility or APR in the CWP DA) is Wilkinson County, Mississippi. (See Ex. 3 Schedule 2.)

17. None of the three Dealer Agreements between Richland and Deere contains a specific end date. Rather it was the understanding of the parties that Richland would continue to be an authorized Deere dealer for so long as Richland continued to capably perform and that if Deere ever had any material concerns about Richland's performance, it would act to terminate the agreements only if Richland failed to correct any material deficiencies in its performance after first being given reasonable notice of those deficiencies and a reasonable time to correct them

18. From the beginning of their relationship, Richland and Deere maintained an amicable business relationship, and both parties continued to perform under the terms of the Dealer Agreements.

19. In 2003, Deere issued a new form of dealer agreement for its dealers to sign that would substantially change many aspects of the relationship. Richland reviewed this new form of dealer agreement and chose not to sign it.

20. After Richland refused to sign the new form of dealer agreement, the relationship between Richland and Deere has deteriorated. For example: Deere (or its affiliates) shortened the period of time by which Richland had to make debt payments; Deere required Richland to order more and more pieces of larger equipment to qualify for volume discounts; Deere delayed many of Richland's equipment orders causing the cancellation by Richland's customers; and Deere frequently changed Richland's AORs and market-share requirements.

21. As early as February 14, 1996, Richland sent a letter to Deere (attached as Exhibit 4) requesting Deere to provide a clear definition of Richland's AOR and the methods by which Deere would calculate Richland's market shares. Richland asked specific questions relating to:

     a.  The territory Deere used to establish the territorial average;

  b. The series of tractors that Deere considered to be agricultural whole goods, which Deere used in its market-share calculation;

  c. The identities of the other dealerships to which Deere was comparing Richland;

  d. The goods Deere considered to be salable in Richland's AOR;

  e. The bases used to establish Richland's market-share targets.

22. Deere failed to answer any of the questions, instead stating that Deere had established a minimum market-share guideline of 25% for dealers in the Atlanta Branch. (See Letter from J.I. Broyles to Jack Jones dated October 26, 1998, attached as Exhibit 5.) Richland is located on the far western edge of the Atlanta Branch territory (locations west of the Mississippi river are in the Dallas Branch). Accordingly, the blanket market-share goal for the Atlanta Branch is not appropriate because of geographic differences.

23. In December 2006, Richland received a letter from Deere (attached as Exhibit 6) announcing that Deere was changing the AORs of dealers in the Atlanta Branch, including Richland, as the result of what Deere called reevaluation. Deere claimed that it used geographical proximity as the predominant factor in undergoing such reevaluation of its dealers' AORs.

24. Deere's tinkering with the AOR and market-share requirements did not end there. On February 15, 2007, Deere required Richland to be responsible for 45% of the under-80 horsepower tractor market in St. Helena Parish, Louisiana (attached as Exhibit 7). On April 26, 2007, Deere increased Richland's responsibility to 50% of the under-80 horsepower market in St. Helena Parish, (attached as Exhibit 8). Subsequently, Deere increased Richland's responsibility in St. Helena Parish to 60% of the under-80 horsepower market, (attached as Exhibit 9).

25. On February 19, 2008, Deere again increased Richland's AOR, and stated that "[s]ubsequent to 2008, we will be increasing the AOR market share requirement until such time

as you consistently perform at an acceptable level." (See Exhibit 9.) In this letter, Deere also threatened to take certain actions if Richland did not improve its market share in the changing AOR and required Richland to submit a detailed business plan to Deere within 60 days, citing sections of Deere's 2003 form dealer agreement that Richland had not signed.

26. In December 2008, Deere sent another letter to Richland (attached as Exhibit 10), again threatening to take actions against Richland and requiring Richland to submit a detailed business plan to Deere. Deere again cited to sections that were not in any of the Dealer Agreements. Further, this letter stated that Deere would be increasing Richland's market-share requirement in 2009.

27. In January 2009, Deere sent a letter (attached as Exhibit 11) acknowledging the incorrect references to the form of agreement that Richland never signed and stating that Richland was not required to provide a business plan. This letter noted that Richland's market-share requirement would not change for 2009 but would thereafter be increasing.

28. Throughout this time, Richland made repeated efforts to increase its market share. Richland repeatedly asked for assistance. Deere, however, was unwilling to provide any. (See Letter from Richland to Deere, February 3, 2009, attached as Exhibit 12).

29. On January 25, 2010, Richland learned that Deere was changing the AOR again, this time using software to draw the AOR based on midpoints between dealers. (See e-mail from Jennifer Fleck, attached as Exhibit 13.) Further, Deere was applying the new AORs retroactively to the start of Deere's fiscal year, November 1, 2009.

30. On February 26, 2010, Deere sent Richland a letter increasing Richland's market-share requirement from 15.7% in 2009 to 20.7% in 2010 (attached as Exhibit 14). Deere increased this requirement while stating that in 2009 Richland achieved a market share of 8.2%. Deere

expected Richland to increase its market share by over 150% when a substantial portion of the year already had elapsed. Further, Deere stated that it would unilaterally increase Richland's market-share requirement annually. Deere also modified Richland's AOR once again.

31. On October 27, 2010, Deere sent a letter to Richland stating that even though Richland had not signed and returned a document dated September 9, 2009, amending the AOR, Deere was unilaterally changing the AOR because "[a]ppropriate notice [had] been given." (See Letter from Deere to Richland dated October 27, 2010, attached as Exhibit 15.)

32. Deere sent Richland a letter terminating the Ag DA on January 5, 2011 (attached as Exhibit 16) on the basis of lack of market penetration. Further, the letter purported to terminate "any other agreements" between Richland and Deere, this despite the fact that Deere failed to provide any notice or opportunity to cure regarding those other agreements.

33.     On October 13, 2011, Richland and Deere entered a Settlement Agreement, according to which Deere agreed to withdraw its termination of Richland immediately. (Attached as Exhibit 17).  The Settlement Agreement provided that Richland's sales in Deere FY 2011 (November 1, 2010-October 31, 2011) would not be relevant to any evaluation of Richland's sales performance (including any subsequent termination decisions). The Settlement Agreement provided a Cure Period (Deere FY 2012 through Deere FY 2014), during which Deere could not attempt to terminate Richland for any alleged market-share deficiencies unless Richland failed to meet the market-share targets for two consecutive years.

34. The Settlement Agreement further provided that, should Richland's market share based on Small Ag sales in Richland's AOR ever drop below 30% (on a Deere fiscal year basis), during any fiscal year subsequent to 2014, Richland would again become eligible for a program that

would require Richland to once again achieve a target market share of Small Ag sales only in Richland's AOR.

35. Following the completion of the Cure Period, Deere continued to unilaterally change Richland's AOR. (See document signed by Jack Jones on June 14, 2016, attached as Exhibit 18.)

36. Without further notice or opportunity to rectify any perceived deficiencies, on February 1, 2017, Deere sent correspondence to Richland in which it asserted that Deere intended to terminate the Ag DA, "as well as any other agreements that may exist" between Richland and Deere, effective August 2, 2017, on the purported basis that Richland's performance was "well below the comparative group average," and Richland had "not achieved market share requirements." (See Letter from Deere to Richland dated February 1, 2017, attached as Exhibit 19.)

37. Richland promptly objected to the termination of the Ag DA. (See Letter from Richland counsel to Deere dated March 28, 2017, attached as Exhibit 20.) Nevertheless, on May 8, 2017, Deere reiterated its threat of termination effective August 2, 2017, claiming that Richland had not maintained adequate sales in Richland's Area of Responsibility ("AOR") for the past three years. (See Letter from Deere counsel to Richland counsel dated May 8, 2017, attached as Exhibit 21.)

38. The Ag DA vaguely defines Richland's AOR as "the town in which his place of business is located and vicinity." (Ex. 1 at p. 2.) Further, the data Deere relies upon to determine market share is unreliable and inaccurate. Deere bases its market-share calculations by accounting for each sale in the county in which each retail customer first uses the equipment. The dealer codes this information on each purchase order. Deere has determined that it unilaterally can change this

information. Such unilateral changes often created inaccurate information upon which Deere relied for determining market share.

39. Additionally, Richland's AOR is geographically unique compared to other Deere dealerships. Richland's customers need equipment for small acreage farms, not for large row crop farms, and the area is covered by 30% to 40% national forest.

40. Further, Deere has arbitrarily and unfairly increased Richland's market share expectations in an economic climate in which Deere has acknowledged that the sale of agricultural equipment is down 15%.

41. Compounding the challenges imposed by its ever-changing AOR and market share requirements, Richland has experienced difficulty in receiving tractors from Deere when ordered. (See emails between Richland and Deere regarding unplaced tractor order, attached as Exhibit 22.) Because Richland is not a large multi-site dealer, it cannot carry a large inventory of every model and must be able to order tractors when customers request specific models. On multiple occasions, customers have ordered tractors and Deere has been unable or unwilling to deliver them to Richland in a timely manner, resulting in the loss of sales and a decrease in Richland's market share.

42. Over the last several years, Deere has been operating a master plan to eliminate the number of individual owners it deals with in the State of Mississippi. In furtherance of this plan, Deere has elected to provide certain preferred dealers with better pricing for the purchase of its products, through the use of lower pricing, rebates, allowances, and other incentives. Through these illegal, anti-competitive strategies, Deere effectively controls the market share for an individual dealer like Richland. Through these illegal and anti-competitive tactics, Deere has eliminated all but two individual dealers of Deere products in Mississippi.

43. Richland has been in business as a John Deere dealer since 1976. Richland is one of the largest employers in the Centreville, Mississippi area, employing 15 people full-time.  Some of these employees have been working for Richland for as much as 40 years.

44. In addition to John Deere equipment, Richland also sells Kuhn, Bush Hog, Husqvarna, and other smaller equipment lines.  In October 2009, Richland became a Mahindra tractor dealer. Richland also operates a hardware store in the same location as its Deere dealership.

45. If Deere moves forward with its attempted termination of the Ag DA, CP DA, and CWP DA, Richland will be forced to close its doors and go out of business, causing economic repercussions through the loss of jobs and the loss of availability of the other equipment, hardware, and machines that Richland provides.

## COUNT I

### Violation of Mississippi Code § 75-77-1 et seq.
### John Deere Agricultural Dealer Agreement

46. Richland realleges and incorporates by reference all of the allegations as though fully set forth herein.

47. Richland qualifies as a "retailer," as that term is defined by Miss. Code § 75-77-l(c).

48. Deere qualifies as a "supplier," as that term is defined by Miss. Code § 75-77-l(e).

49. The John Deere Agricultural Dealer Agreement, entered into in January 1986, regulates the relationship between Richland and Deere and is a retail agreement to which the Act applies. Miss. Code § 75-77-17.

50. The Act prohibits a supplier from terminating a retail agreement without "good cause." Miss. Code § 75-77-2(1)

51.  Even if a supplier has good cause to terminate a retail agreement, the supplier may not terminate the retail agreement unless: (1) the supplier "provide[s] a retailer with at least ninety

(90) days written notice of termination"; and (2) "a sixty (60) day right-to-cure the deficiency." If the deficiency is cured "within the allotted time, the notice is void."  Miss. Code § 75-77-2(2).

52. When the termination is due to market penetration, "a reasonable period of time shall have existed where the supplier has worked with the dealer to gain the desired market share." Miss. Code § 75-77-2(2).

53. Richland has fully performed its obligations under the Ag DA.

54. Deere has attempted to terminate the Ag DA for Richland's alleged failure to meet market penetration goals.

55. Deere has violated the Act by, as detailed above, (1) terminating the Ag DA without good cause; (2) failing to specify the action required to cure any purported deficiencies in Richland's performance; (3) failing to work with Richland to gain the desired market share; and (4) failing to provide a reasonable time for Richland to gain the desired market share.

56. Pursuant to the Act, an unlawfully terminated retailer is entitled to injunctive relief, in addition to damages sustained by the retailer as a result of the supplier's violation, including all costs and attorney fees.  Miss. Code § 75-77-16.

57. Accordingly, as a direct and proximate result of Deere's violation of the Act, Richland is entitled to an injunction prohibiting the termination of the Ag DA, together with Richland's costs, disbursements, and attorneys' fees.

58. In the alternative, Richland is entitled to recover the damages it has suffered, including its lost future profits, in an amount which has yet to be determined, but which amount is reasonably believed to exceed $75,000, together with Richland's costs, disbursements, and attorneys' fees.

## COUNT II

### Violation of Mississippi Code § 75-77-1 et seq.
### John Deere Consumer Products Dealer Agreement

59. Richland realleges and incorporates by reference all of the allegations as though fully set forth herein.

60. Richland qualifies as a "retailer," as that term is defined by Miss. Code § 75-77-1(c).

61. Deere qualifies as a "supplier," as that term is defined by Miss. Code § 75- 77-l(e).

62. The CP DA, entered into in January 1986, regulates the relationship between Richland and Deere and is a retail agreement to which the Act applies. Miss. Code § 75-77-17.

63. The Act prohibits a supplier from terminating a retail agreement without "good cause." Miss. Code § 75-77-2(1)

64. Even if a supplier has good cause to terminate a retail agreement, the supplier may not terminate the retail agreement unless: (1) the supplier "provide[s] a retailer with at least ninety (90) days written notice of termination"; (2) the supplier provides "a sixty (60) day right-to-cure the deficiency"; and (3) the notice provides "all reasons constituting good cause for action." If the deficiency is cured "within the allotted time, the notice is void."   Miss. Code § 75-77-2(2).

65. Richland has fully performed its obligations under the CP DA.

66. Deere has attempted to terminate "any ... agreements" between Deere and Richland, including the CP DA, for Richland's alleged failure to meet market-penetration goals under the Ag DA. Nowhere in the CP DA is the termination of another dealer agreement between the parties' grounds for the termination of the CP DA.

67. Deere has violated the Act by (1) terminating the CP DA without good cause; (2) failing to state the reasons constituting good cause for termination; (3) failing to specify the action

required to cure any purported deficiencies in Richland's performance; and (4) failing to provide a reasonable time for Richland to cure any deficiency.

68. Pursuant to the Act, an unlawfully terminated retailer is entitled to injunctive relief, in addition to damages sustained by the retailer as a result of the supplier's violation, including all costs and attorney fees. Miss. Code § 75-77-16.

69. Accordingly, as a direct and proximate result of Deere's violation of the Act, Richland is entitled to an injunction prohibiting the termination of the CP DA, together with Richland's costs, disbursements, and attorneys' fees.

70. In the alternative, Richland is entitled to the damages it has suffered, including its lost future profits, in an amount which has yet to be determined, but which amount is reasonably believed to exceed $75,000, together with Richland's costs, disbursements, and attorneys' fees.

## COUNT III

### Violation of Mississippi Code § 75-77-1 et seq.
### John Deere Commercial Worksite Products Dealer Agreement

71. Richland realleges and incorporates by reference all of the allegations as though fully set forth herein.

72. Richland qualifies as a "retailer," as that term is defined by Miss. Code § 75-77-l(c).

73. Deere qualifies as a "supplier," as that term is defined by Miss. Code § 75- 77-l(e).

74. The CWP DA, entered into in 2001, regulates the relationship between Richland and Deere and is a retail agreement to which the Act applies. Miss. Code § 75-77-17.

75. The Act prohibits a supplier from terminating a retail agreement without "good cause." Miss. Code § 75-77-2(1).

76. Even if a supplier has good cause to terminate a retail agreement, the supplier may not terminate the retail agreement unless: (1) the supplier "provide[s] a retailer with at least ninety

(90) days written notice of termination"; (2) the supplier provides "a sixty (60) day right-to-cure the deficiency"; and (3) the notice provides "all reasons constituting good cause for action." If the deficiency is cured "within the allotted time, the notice is void." Miss. Code § 75-77-2(2).

77. Richland has fully performed its obligations under the CWP DA.

78. Deere has attempted to terminate "any … agreements" between Deere and Richland, including the CWP DA, for Richland's alleged failure to meet market-penetration goals under the Ag DA.

79. Deere has violated the Act by (1) terminating the CWP DA without good cause; (2) failing to state the reasons constituting good cause for termination; (3) failing to specify the action required to cure any purported deficiencies in Richland's performance; and (4) failing to provide a reasonable time for Richland to cure any deficiency.

80. Pursuant to the Act, an unlawfully terminated retailer is entitled to injunctive relief, in addition to damages sustained by the retailer as a result of the supplier's violation, including all costs and attorney fees. Miss. Code § 75-77-16.

81. Accordingly, as a direct and proximate result of Deere's violation of the Act, Richland is entitled to an injunction prohibiting the termination of the CWP DA, together with Richland's costs, disbursements, and attorneys' fees.

82. In the alternative, Richland is entitled to the damages it has suffered, including its lost future profits, in an amount which has yet to be determined, but which amount is reasonably believed to exceed $75,000, together with Richland's costs, disbursements, and attorneys' fees.

## COUNT IV

### Breach of Contract and the Implied Covenant of Good Faith and Fair Dealing
### John Deere Agricultural Dealer Agreement

83. Richland realleges and incorporates by reference all of the allegations as though fully set forth herein.

84. All contracts contain an implied covenant of good faith and fair dealing, which requires the parties to the agreement to act honestly, in good faith, in accordance with reasonable standards of fair dealing in the trade, and in a nondiscriminatory, commercially reasonable manner. The implied covenant of good faith and fair dealing also prohibits either party from engaging in any conduct that would deprive the other party of the expected fruits of the agreement or the benefit of the bargain. *See Cenac v. Murry*, 609 So. 2d 1257, 1272 (Miss. 1992).

85. The implied covenant of good faith and fair dealing prevents Deere from acting in a bad faith, discriminatory, or commercially unreasonable manner and requires Deere use its ¶The Ag DA provides that Deere can terminate the Agreement by written notice 180 days before the effective date of termination if Deere, in its discretion, "believes [Richland] is not fulfilling the requirements of [its] appointment despite the opportunity to correct or to take appropriate action toward correcting deficiencies in [its] operations which have been called to [its] attention by [Deere]." (Ex. 1 at ¶ 3(b).)

86. The Ag DA merely states that Richland's AOR is the town in which Richland's business is located and its vicinity and is silent on Deere's ability to unilaterally change the AOR. (Ex. 1 at p. 2.)

87. Richland has, at all times relevant hereto, fully performed its obligations under the Ag DA.

88. As set forth in more detail above, Deere has breached the Ag DA and implied covenant of good faith and fair dealing by terminating Richland in a bad faith, discriminatory, and commercially unreasonable manner.

89. Further, as set forth in more detail above, Deere has breached the implied covenant of good faith and fair dealing by unilaterally setting AOR and market-share requirements in a bad faith, discriminatory and commercially unreasonable manner.

90. If Deere is allowed to terminate the Ag DA with Richland on August 2, 2017, Richland will be irreparably harmed and monetary damages would be inadequate as compensation because of the loss of goodwill, customers, and Richland's business as a whole.

91. Accordingly, as a direct and proximate result of Deere's breaches of the Ag DA and the implied covenant of good faith and fair dealing, Richland is entitled to an injunction preventing the termination of the Ag DA.

92. Alternatively, Richland is entitled to the damages Richland would suffer on termination, including its lost future profits, in an amount which has yet to be determined, but which amount is reasonably believed to exceed $75,000.

## COUNT V

### Breach of Contract and the Implied Covenant of Good Faith and Fair Dealing
### John Deere Consumer Products Dealer Agreement

93. Richland realleges and incorporates by reference all of the allegations as though fully set forth herein.

94. All contracts contain an implied covenant of good faith and fair dealing, which requires the parties to the agreement to act honestly, in good faith, in accordance with reasonable standards of fair dealing in the trade, and in a nondiscriminatory, commercially reasonable manner. The implied covenant of good faith and fair dealing also prohibits either party from

engaging in any conduct that would deprive the other party of the expected fruits of the agreement or the benefit of the bargain. *See Cenac v. Murry*, 609 So. 2d 1257, 1272 (Miss. 1992).

95. The implied covenant of good faith and fair dealing prevents Deere from acting in a bad faith, discriminatory, or commercially unreasonable manner and requires Deere use its discretion, when it is afforded such discretion under the agreement, in a good faith manner.

96. The CP DA provides that Deere may terminate the CP DA for 1) a change in ownership; 2) financial failure of the dealership; 3) change in location of the dealership; 4) mutual consent of the parties; 5) 180 days written notice if Deere believes sufficient sales potential does not exist in the trade area or Deere believes the dealer is not fulfilling the requirements of the appointment despite the opportunity to correct; or 6) a new Dealer Agreement is executed by the parties. (Ex. 2 at ¶¶ 3 & 4.)  None of these conditions has been met.

97. Richland has, at all times relevant hereto, fully performed its obligations under the CP DA

98. Deere has breached the CP DA and implied covenant of good faith and fair dealing by terminating Richland in a bad faith, discriminatory, and commercially unreasonable manner. Nowhere in the CP DA is Deere granted the right to terminate the CP DA on the termination of any other agreement between the parties.

99. Further, as set forth in more detail above, Deere has breached the implied covenant of good faith and fair dealing by unilaterally setting AOR and market-share requirements in a bad faith, discriminatory and commercially unreasonable manner.

100.     If Deere is allowed to terminate the CP DA with Richland on August 2, 2017, Richland will be irreparably harmed and monetary damages would be inadequate as compensation because of the loss of goodwill, customers, and Richland's business as a whole.

101.     Accordingly, as a direct and proximate result of Deere's breaches of the CWP DA and the implied covenant of good faith and fair dealing, Richland is entitled to an injunction preventing the termination of the CP DA.

102.     Alternatively, Richland is entitled to the damages Richland would suffer on termination, including its lost future profits, in an amount which has yet to be determined, but which amount is reasonably believed to exceed $75,000.

## COUNT VI

### Breach of Contract and the Implied Covenant of Good Faith and Fair Dealing
### John Deere Commercial Worksite Products Dealer Agreement

103.     Richland realleges and incorporates by reference all of the allegations as though fully set forth herein.

104.     All contracts contain an implied covenant of good faith and fair dealing, which requires the parties to the agreement to act honestly, in good faith, in accordance with reasonable standards of fair dealing in the trade, and in a nondiscriminatory, commercially reasonable manner. The implied covenant of good faith and fair dealing also prohibits either party from engaging in any conduct that would deprive the other party of the expected fruits of the agreement or the benefit of the bargain. *See Cenac v. Murry*, 609 So. 2d 1257, 1272 (Miss. 1992).

105.     The implied covenant of good faith and fair dealing prevents Deere from acting in a bad faith, discriminatory, or commercially unreasonable manner and requires Deere to use its discretion, when it is afforded such discretion under the agreement, in a good faith manner.

106.     The CWP DA gives Deere discretion by providing that Deere may terminate the CWP DA upon the termination of any John Deere Dealer Agreement the dealer has with Deere. (Ex. 3 at ¶ 3(f).)

107.     Richland has, at all times relevant hereto, fully performed its obligations under the CWP DA.

108.     Deere has breached the CWP DA and implied covenant of good faith and fair dealing by terminating Richland in a bad faith, discriminatory, and commercially unreasonable manner.  Deere has threatened to terminate the CWP DA based on Deere's termination of the Ag DA. As detailed above, the termination of the Ag DA itself is a breach of contract and a breach of the implied covenant of good faith and fair dealing. Accordingly, termination of the CWP DA on this basis is a breach of good faith and fair dealing.

109.     Further, as set forth in more detail above, Deere has breached the implied covenant of good faith and fair dealing by unilaterally setting AOR and market-share requirements in a bad faith, discriminatory and commercially unreasonable manner.

110.     If Deere is allowed to terminate the CWP DA with Richland on August 2, 2017, Richland will be irreparably harmed and monetary damages would be inadequate as compensation because of the loss of goodwill, customers, and Richland's business as a whole.

111.     Accordingly, as a direct and proximate result of Deere's breaches of the CWP DA and the implied covenant of good faith and fair dealing, Richland is entitled to an injunction preventing the termination of the CWP DA.

112.     Alternatively, Richland is entitled to the damages Richland would suffer on termination, including its lost future profits, in an amount which has yet to be determined, but which amount is reasonably believed to exceed $75,000.

## COUNT VII

## Detrimental Reliance

113.     Deere has repeatedly represented to Richland, through terms the Ag DA, the CP DA, and the CWP DA, as well as the 2011 Settlement Agreement, and the course of dealings and conduct of the parties, that it would work with and assist Richland to meet Deere's market share goals for Richland.

114.     Deere has failed and refused to work with and assist Richland in meeting the market share goals that were unilaterally and arbitrarily set by Deere.  In fact, Deere has impeded Richland's ability to meet those market share goals by continuously and arbitrarily changing Richland's AOR; changing Richland's market share goals without clearly communicating its expectations to Richland; and failing and refusing to deliver products to Richland in a timely manner to enable it to meet its goals.

115.     Richland reasonably relied, to its detriment, on Deere's representations that it would work with and assist Richland in meeting Deere's market share goals for Richland, and it has suffered or will suffer actual damages as a result.

116.     Accordingly, Richland is entitled to an injunction preventing the termination of the Ag DA, the CP DA, and the CWP DA.

117.     Alternatively, Richland is entitled to the damages Richland would suffer on termination, including its lost future profits, in an amount which has yet to be determined, but which amount is reasonably believed to exceed $75,000.

## COUNT VIII

### Violation of the Robinson-Patman Act

118.     A seller charging competing buyers different prices for the same "commodity" or discriminating in the provision of "allowances" violates the Robinson-Patman Act, an amendment to the Clayton Antitrust Act. 15 U.S.C. § 13(a).   This kind of price discrimination illegally gives favored customers an edge in the market.

119.     Deere has unlawfully discriminated against Richland in the course of interstate commerce by granting discounts, promotions, special services, and rebates to other retailers, but not to Richland.

120.     Deere has provided commodities of like grade and quality to favored buyers other than Richland for lower prices, and has given favored buyers more allowances for the purchase of like commodities than Deere has provided to Richland, for the purpose of destroying competition in the state.

121.     These unfair, discriminatory, and illegal sales practices have taken place in interstate commerce.

122.     As of the time the price differential was imposed by Deere, the favored purchasers and Richland, the disfavored purchaser, competed at the same functional level, as retailers, and within the same geographic market.

123.     Richland was engaged in actual competition with the favored purchasers as of the time of the price differential.

124.     Deere's actions in giving favored competitors preferential pricing and allowances have resulted in actual harm to Richland's business, through the loss of sales, the loss of customers, and the loss of the trust and goodwill of its customers.

125.     Pursuant to the Clayton Antitrust Act, a person injured as a result of the violation of the antitrust laws is entitled to injunctive relief, in addition to treble damages sustained by the plaintiff as a result of the defendant's violation, as well as all costs and attorneys' fees. 15 U.S.C. § 15(a).

126.     Accordingly, Richland is entitled to an injunction preventing Deere's actions in giving favored competitors preferential pricing and allowances.

127.     Alternatively, Richland is entitled to an award in the amount of triple the actual has suffered as a result of Deere's actions in giving favored competitors preferential pricing and allowances, including its lost profits, in an amount which has yet to be determined, but which amount is reasonably believed to exceed $75,000.

### COUNT IX

### Violation of the Sherman Antitrust Act

128.     The Sherman Act makes illegal any contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce. 15 U.S.C. § 1.

129.     Deere's actions in granting preferred treatment, pricing, product availability, and other incentives to Richland's competitors, to the exclusion of Richland, constitute a contract, combination, or conspiracy between Deere and these retailers, which illegally restrains competition in interstate trade or commerce.

130.     The Sherman Antitrust Act also prohibits monopolies and attempted monopolies of any part of interstate trade or commerce. 15 U.S.C. § 2.

131.     Deere's actions in granting preferred treatment, pricing, product availability, and other incentives to Richland's competitors, to the exclusion of Richland, and its termination of

the Ag DA, CP DA, and DWP DA, constitute predatory or anticompetitive conduct, and demonstrate a specific intent to monopolize the sale of agricultural products in Mississippi.

132.     Deere's actions in giving favored competitors preferential pricing and allowances have directly resulted in real harm to Richland's business, through the loss of sales, the loss of customers, and the loss of the trust and goodwill of its customers.

133.     If Deere is allowed to terminate the Ag DA, the CP DA, and/or the CWP DA with Richland on August 2, 2017, Richland will be irreparably harmed because of the loss of goodwill, customers, and Richland's business as a whole.

134.     Pursuant to the Clayton Antitrust Act, a person injured as a result of the violation of the antitrust laws is entitled to injunctive relief, in addition to treble damages sustained by the plaintiff as a result of the defendant's violation, as well as all costs and attorney fees.  15 U.S.C. § 15(a).

135.     Accordingly, Richland is entitled to an injunction preventing Deere's actions in giving favored competitors preferential pricing and allowances, and preventing the termination of the Ag DA, the CP DA, and the CWP DA.

136.     Alternatively, Richland is entitled to an award in the amount of triple the actual damages Richland would suffer on termination of the agreements, including its lost future profits, in an amount which has yet to be determined, but which amount is reasonably believed to exceed $75,000.

## COUNT X

### Violation of the Mississippi Antitrust Law

137.     The Mississippi Antitrust Law, Miss. Code Ann. § 75-21-1 *et seq.*, prohibits a combination, contract, understanding or agreement, expressed or implied, to restrain trade, to

limit, increase or reduce the price of a commodity, or to hinder competition in the production, importation, manufacture, transportation, sale or purchase of a commodity.

138.     Deere's actions in granting preferred treatment, pricing, product availability, and other incentives to Richland's competitors, to the exclusion of Richland, constitute a contract, combination, or conspiracy between Deere and these retailers, which illegally restrains trade, reduces the price of a commodity, and hinders competition in the sale of a commodity.

139.     Deere's actions in giving favored competitors preferential pricing and allowances have directly resulted in real harm to Richland's business, through the loss of sales, the loss of customers, and the loss of the trust and goodwill of its customers.

140.     Pursuant to Mississippi Code § 75-21-9, Richland is entitled to an award in the amount of the actual damages Richland would suffer on termination, including its lost future profits, in an amount which has yet to be determined, but which amount is reasonably believed to exceed $75,000.

## COUNT IX

### Tortious Breach of Contract

141.     Deere has intentionally, willfully, maliciously, and tortiously interfered with Richland's lawful business relations by failing to supply Richland with certain agricultural products, thus diverting existing and prospective customers and business opportunities away from Richland.

142.     Deere acted without any right or justifiable cause in failing to supply Richland with requested agricultural products.

143.     Deere's actions were done with the unlawful purpose of causing damage and loss to Richland in its lawful business.

144.     Deere's actions resulted in actual financial loss and injury to Richland's business through the loss of sales, loss of customers, and loss of goodwill of its customers, in an amount which has yet to be determined, but which amount is reasonably believed to exceed $75,000.

## COUNT X

### Request for Temporary Injunction and Permanent Injunction

145.     Richland realleges and incorporates by reference all of the allegations as though fully set forth herein.

146.     Due to the misconduct of Deere (and Deere's affiliates and/or subsidiaries), as set forth in more detail above, Richland has a strong likelihood of success on the merits as illustrated in Counts I through IX of this Verified Complaint.

147.     Furthermore, Richland will suffer irreparable harm through the destruction of its business if this Court does not prevent Deere from terminating the Ag DA, CP DA, and CWP DA; the threatened injury to Richland substantially outweighs any potential harm caused to Deere from this Court granting an injunction; and the granting of an injunction would serve the public interest.

148.     Accordingly, pursuant to Miss. Code § 75-77-16 and the common law of Mississippi, Richland is entitled to a temporary injunction and a permanent injunction preventing Deere from wrongfully terminating the Ag DA, CP DA, and DWP DA.

**WHEREFORE**, Richland respectfully requests the Court to grant the following relief:

1.     A judgment awarding Richland an injunction prohibiting termination of the Ag DA, CP DA and CWP DA;

2.     A judgment awarding Richland an injunction preventing Deere's actions in giving favored competitors preferential pricing and allowances;

3.  A judgment awarding Richland its full amount of damages, or, in the alternative, triple its actual damages pursuant to the antitrust laws;

4.  A judgment awarding Richland its costs, disbursements, and reasonable attorneys' fees incurred herein, to the extent authorized by law; and

5.  A judgment awarding Richland such other and further relief as the Court deems just and appropriate.

Dated: This_____ day of June, 2017.

Respectfully submitted,

_____
Robert C. Latham, Esq.
**TRULY-SMITH & LATHAM, PLLC**
320 Main Street
Post Office Box 1307
Natchez, MS 39121-1307
Telephone: (601) 442-6495
*Email: rclatham@bellsouth.net*