DUPLICATE

# JOHN DEERE CONSUMER PRODUCTS DEALER AGREEMENT

Dealer: Richland Equipment Co. Inc
Town: Centreville
State: Mississippi



EXHIBIT 2

# John Deere Company Authorized Consumer Products Dealer Agreement

Upon acceptance by John Deere Company (hereafter called the "Company"), the undersigned Dealer is appointed a John Deere Authorized Consumer Products Dealer to merchandise those items sold by the Company as its Consumer Products Line, which are the items set forth in the John Deere Consumer Products price list, including certain of its Utility Tractors, Compact Utility Tractors, JDM products and parts for all of the foregoing, hereafter collectively called "Goods". The Dealer is an independent retail merchant who purchases Goods for resale for the principal benefit of the Dealer.

**1. OBLIGATIONS OF THE PARTIES**

During the period of the Dealer's appointment as a John Deere Authorized Consumer Products Dealer, the parties accept the following obligations and duties:

**(a) Order Acceptance.** The Company agrees to accept orders placed by the Dealer for Goods which the Company contemplates will be shipped during the period of appointment, subject to the Conditions of Sale set forth herein.

**(b) Availability of Programs.** The Company agrees that the Dealer will have the benefit of any Finance Plans, Lease Plans, Floor Plans, Parts Return Programs, Sales or Incentive Programs or similar plans or programs which it makes available from time to time to other Authorized Consumer Products Dealers. Such plans or programs may contain standards, conditions or requirements of uniform application which the Dealer must meet in order to use or benefit from them. State or local laws or regulations may require variations from standard plans or programs.

**(c) Right to Sell.** Without limiting the right of the Company to choose those with whom it deals, the Company may sell, loan or lease Goods as follows without restriction:
    (i)    To Federal, state and local governments.
    (ii)   To educational institutions and agricultural experiment stations.
    (iii)  To its competitors (for test purposes).
    (iv)  To equipment manufacturers.
    (v)   To its own employees.
    (vi)  Repossessed Goods (new or used).
    (vii) To accounts classified by the Company as national accounts.

**(d) Facilities and Working Capital.** The Dealer agrees to maintain a modern, suitable place of business with adequate space and facilities for sales, service, display and storage, and to provide adequate working capital to fulfill his obligations under this agreement.

2

(e) **Personnel.** The Dealer agrees to provide competent management and a sufficient staff of personnel which is adequately trained to carry out his obligations under this Agreement and, in particular, will cooperate with the Company by sending such personnel to attend conferences and training schools provided by the Company.

(f) **Sales Promotion.** The Dealer agrees to actively promote the sale of all Goods which are usable in the Dealer's trade area and to maintain an inventory of Goods in proportion to the sales potential in such area.

(g) **Service.** The Dealer agrees to provide service equipment, an adequate stock of service parts and those appropriate special tools necessary to promptly fulfill the warranty obligations of both the Dealer and the Company, perform product improvement programs and meet the non-warranty service requirements of users of Goods in the Dealer's trade area.

(h) **Setup, Adjustment and Manuals.** The Dealer agrees to properly set up and adjust goods prior to sale, furnish the customer a copy of the operator's or owner's manual, and instruct the customer in the proper and safe operation of Goods.

(i) **Periodic Reviews.** In order that a satisfactory level of dealer performance may be obtained, the Dealer agrees to cooperate with the Company in periodic reviews of the performance of his obligations under this Agreement and to take appropriate action to correct deficiencies discussed in such reviews.

(j) **Place of Business.** The Dealer agrees to maintain his principal place of business at the location set forth on the signature page of this Agreement, and will not, either directly or indirectly, establish, maintain, or operate a facility at any other location for displaying, selling, renting, leasing, or servicing of new or used Goods, without the prior written approval of the Company.

2. **CONDITIONS OF SALE**

Orders for Goods placed by the Dealer and accepted by the Company will be governed by the following conditions of sale, whether or not such orders are placed or filled after the cancellation or termination of the period of appointment.

(a) **Conditions Affecting Delivery.** The Company shall have no liability to the Dealer for delay or failure to ship Goods due to a cause beyond its control, or if the Dealer's appointment has been canceled or terminated, or if the demand for Goods exceeds the available supply. The Company may decline to make shipments if, in its opinion, the Dealer's financial condition does not justify the extension of additional credit, the Dealer has consistently failed to perform his obligations under the terms of this Agreement, or shipment would result in larger inventories of such Goods than the Company is willing to finance.

(b) **Title to Goods.** Title to and ownership of Goods and risk of loss (except as provided in the next sentence) shall pass to the Dealer upon delivery to a carrier (including agents or employees of the Dealer). The Company will bear the risk of loss during the transportation of shipments by Parcel Post, United Parcel Service or other similar parcel services used by the Company.

(c) **Shipments.** Dealer requests for manner of shipment will ordinarily be adhered to unless the Dealer's request appears to be impractical under the circumstances. If Goods are to be called for by the Dealer on or before a specified date and are not called for on or before such date, they may be shipped by the Company in any manner considered advisable.

(d) **Shortages.** All claims that Goods were shipped short by the Company must be made by the Dealer in writing within five days after receipt of the shipment in question.

(e) **Design Changes.** The Company has no obligation to furnish dealers with changes in design or construction on Goods previously shipped despite incorporation of such changes in current shipments.

**(f) Prices and Terms.** Unless otherwise provided in a bulletin issued by the Company, prices and terms of payment on all Goods shall be the Company's published dealer prices and terms in effect on the date of shipment. Such published prices and terms may be changed by the Company at any time, and dealers will be notified of such changes, but any such change will become effective on the date indicated whether or not the Dealer has actually received notice thereof.

**(g) Substitution of New Model Machines.** If the particular model of machine ordered is no longer available and has been replaced by a new model, the Company may, upon authorization by the Dealer, substitute the new model machine, and the price and terms shall be those applicable to the new model machine. If the Dealer does not authorize the substitution, the Dealer's order will be canceled.

**(h) Payment.** The Dealer shall promptly pay the Company at the place designated by the Company, for all Goods and other charges connected with the shipment as provided in the Company's published Dealers Terms Schedule. All payments shall be made in cash except when otherwise provided in Finance Plans, Lease Plans, Floor Plans, or other plans, programs or bulletins issued to the Dealer by the Company.

### 3. CANCELLATION

The Company may cancel the Dealer's appointment at any time after the happening of any of the following:

(a) Death of an individual proprietor, partner, major shareholder, or the manager of the dealership;

(b) Withdrawal of an individual proprietor, partner, major shareholder, or the manager of the dealership, without prior written consent of the Company;

(c) Default (see Section 10, Default);

(d) A change, without the prior written approval of the Company, in the location of the Dealer's principal place of business under this Agreement;

(e) Revocation or discontinuance of any guaranty of the Dealer's present or future obligations to the Company.

### 4. TERMINATION ON SPECIFIED DATE

Unless the Dealer's appointment is canceled under Section 3, it shall continue until it is terminated by one or both of the parties as provided in this Section 4. The Dealer's appointment may be terminated at any time:

(a) by the mutual written consent of the parties, with the effective date of such termination to be such as may be mutually agreed upon; or

(b) by written notice given by the Company to the Dealer at least one hundred eighty (180) days prior to the effective date specified in such notice if the Company determines that the Dealer's trade area does not afford sufficient sales potential to continue to reasonably support an authorized dealer or if the Company believes the Dealer is not fulfilling the requirements of his appointment despite the opportunity to correct or to take appropriate action toward correcting deficiencies in his operations which have been called to his attention by the Company; or

(c) by written notice given by the Dealer to the Company at least one hundred eighty (180) days prior to the effective date specified in such notice; or

(d) by the execution of a new Authorized Dealer Agreement between the parties which is intended to supersede this Agreement or by the Dealer's failure to execute a new Authorized Dealer Agreement within 30 days after it has been offered by the Company.

In the event of a termination under Section 4(b), if the Company did not notify the Dealer prior to 31 October 1984 that it did not intend to offer him a new Agreement for the contract year ending 31 October 1986, the effective date of any termination may not be prior to 31 October 1986.

4

### 5. EFFECT OF CANCELLATION OR TERMINATION OF APPOINTMENT

After the Dealer's appointment is canceled under the provisions of Section 3, or after the effective date of termination under Section 4, either party may discontinue doing business with the other at any time, subject only to the rights and duties set forth herein. After such time, unfilled orders may be canceled by either party. Submission or acceptance of orders after the period of appointment does not consitute agreement by either party to an extension of the period of appointment. Except as provided herein, neither party is entitled to any compensation or reimbursement for loss of prospective profits, anticipated sales or other losses occasioned by cancellation or termination. Cancellation or termination does not affect the obligations of either party with respect to Goods already delivered to the Dealer or any security for such obligations.

### 6. DEATH OF DEALER: COOPERATION WITH SURVIVORS

If the Dealer's appointment is canceled because of the death of one of the persons enumerated in Section 3(a), it is agreed:

(a) That if the heirs or surviving associates (hereafter called "Successors") wish to continue operating the dealership, the Company will cooperate with them in their effort to arrange to do so, provided that shipments will be made only if the Company is satisfied that the Successors are bound by this Agreement. The Company will offer to execute a new Dealer Agreement with the Successors if it believes them to be capable of carrying out the obligations thereunder.

(b) That the Company shall have discharged its obligations under Subsection (a) under any of the following conditions:

    (i) The Company informs the Successors in writing that it will not execute a new Dealer Agreement and 180 days shall have elapsed since such death.

    (ii) The Company receives written notification that the Successors do not wish to enter into a new Dealer Agreement.

    (iii) The Successors cannot agree on appropriate arrangements for carrying on the business.

    (iv) Any of the events enumerated in Subsections (c) through (e) of Section 3 has occurred or shall occur.

### 7. REPURCHASE OF GOODS

If any of the following events occur, the Company agrees to buy and the Dealer agrees to sell Goods as provided in Section 8:

(a) The Dealer's appointment is canceled under Section 3 (and in the case of cancellation because of death of one of the persons enumerated in Section 3(a), one of the conditions enumerated in Section 6(b) has occurred).

(b) The Dealer's appointment is terminated under Section 4(a), 4(b) or 4(c); or

(c) The Dealer has not executed a new Authorized Dealer Agreement within 30 days after it has been offered by the Company.

The Company shall be relieved of this obligation if a default occurs or has occurred under this Agreement or under any Chattel Mortgage or Security Agreement between the Company and the Dealer, and the Company elects to exercise its rights under such Agreement, Chattel Mortgage or Security Agreement to take possession of goods.

### 8. TERMS OF REPURCHASE

Except where otherwise provided by the laws of the state where the Dealer is located, if the Company becomes obligated to repurchase Goods under Section 7, then the Company will buy and the Dealer will sell (or may sell subject to Subsection (c)) free and clear of all liens and encumbrances the following Goods, provided they were either originally purchased by the Dealer from the Company or purchased from other dealers with the written approval of the Company, and are listed in the Company's published price list for that category of Goods, in effect on the effective date of cancellation or termination of the Dealer's appointment.

(a) All current complete machines and attachments in the Dealer's possession unsold (which category excludes all items listed in the JDM Price List or John Deere Parts Price List) which are new, unused, complete and in good condition. The prices to be paid for such items will be the invoice prices (but not more than current dealer prices), plus freight from the factory to the Dealer's location at truckload (24,000#) rates for items on which freight was paid by the Dealer, less any discounts from invoice price which have been allowed and less the reduction in value, if any, resulting from deterioration.

(b) All current parts in the Dealer's possession unsold which are new, unused, in good condition and are resalable as new parts without repackaging or reconditioning. The prices to be paid for such items will be the current wholesale price as listed in the John Deere Parts Price List, less a discount of:

    (i) 15% on items listed as returnable under the Company's parts return policy; and

    (ii) 50% on all other items.

(c) All current JDM products in the Dealer's possession unsold which the Dealer may elect to sell to the Company and which are new, unused, in good condition and are resalable as new products without repackaging or reconditioning. The Company shall have no obligation to repurchase such products unless the Dealer furnishes the Company with a list of the products which he wishes to sell to the Company within thirty (30) days after the effective date of cancellation or termination of his appointment. The price to be paid for such products will be the current wholesale price listed in the JDM Price List less a discount of:

    (i) 50% on products identified by an asterisk (*);

    (ii) 15% on items listed as returnable under the Company's parts return policy; and

    (iii) 25% on all other JDM products.

At the written request of the Company, the Dealer will list, tag, pack, load and transport all repurchased Goods to the nearest location regularly maintained by the Company for the storage of such Goods or to such closer location as may be designated by the Company or pay for the cost of transportation to such location. The risk of loss shall be on the Dealer until the vehicle transporting such Goods reaches the designated destination. Should the Dealer fail to fulfill the above obligation within 60 days after he has been requested to do so, the Company may enter the Dealer's premises, perform these duties and charge the Dealer's account for any expenses incurred in so doing.

The Company may pay for repurchased Goods in cash or by giving the Dealer credit to be applied to any indebtedness then owed by the Dealer to the Company or to any other company having a corporate affiliation with the Company whether or not such indebtedness is then due and payable. If there is still a balance owing by the Dealer after the price of the repurchased Goods, less any Company-incurred expenses of recovery, including reasonable attorney's fees and legal expenses, has been credited to the Dealer, such balance shall be immediately due and payable to the Company regardless of the original terms of payment thereon.

**9. SECURITY**

Security Agreements or Mortgages given to the Company by dealers who handle other John Deere products apply to Goods also. However, if the Dealer does not handle other John Deere products or if no other instrument provides the Company with a security interest in Goods, the following provisions apply and are not affected by cancellation or termination of the Dealer's appointment hereunder:

6

To secure all of his indebtedness to the Company, the Dealer hereby grants to the Company a security interest in his inventory of Goods as it may from time to time be constituted, located either at the address herein set forth or at any other location used by the Dealer for storing Goods, in transit, or on rental or demonstration. Such security interest shall also include additions or replacements to the Dealer's present stock and shall also extend to all proceeds (as defined in the Uniform Commercial Code) of the sale or rental of such inventory and to all insurance proceeds of such inventory.

Goods may be sold in the ordinary course of business, but the Dealer will not otherwise sell, encumber or deal with them. The Dealer will store Goods indoors at the address set forth herein or at any other storage location approved in writing by the Company at his expense and risk of loss, and will pay when due all taxes, license fees or other charges against them or on the sale thereof. All Goods secure the entire indebtedness of the Dealer to the Company, and each item remains security for such indebtedness even if its own purchase price is paid.

To further secure his indebtedness to the Company, the Dealer hereby:

(a) Assigns to the Company any and all accounts or contracts, including rights to insurance proceeds of all inventory described in this Section 9, owed to him by other companies having a corporate affiliation with the Company; and

(b) Grants to the Company a security interest in his reserve accounts and contingent earnings accounts, as described in the John Deere Consumer Products Dealer Finance Agreement and in the John Deere Consumer Products Dealer Leasing Agreement with the John Deere Leasing Company.

The Dealer will execute such additional security agreements, chattel mortgages, financing statements and the like, and amendments and additions thereto or to existing instruments, as the Company requests, in order that the Company may have at all times a first lien on Goods securing the Dealer's indebtedness to the Company.

**10. DEFAULT**

The following shall constitute events of default by the Dealer:

(a) (i) The Dealer defaults in the payment or performance of any obligation to the Company; (ii) The Dealer, in violation of Section 9 hereof, sells or disposes of Goods or proceeds, including trade-ins, or allows any lien or encumbrance to be created or remain thereon; (iii) The Dealer (or any member of the Dealer's firm if a partnership) becomes insolvent, makes an assignment for the benefit of creditors, institutes or has instituted against him proceedings under any bankruptcy or insolvency law, or the Dealer has his stock in trade or any part thereof levied upon or attached; (iv) Closeout or sale of a substantial part of the Dealer's business related to the handling of Goods, or commencement of dissolution or liquidation of the Dealer if a partnership or corporation; (v) Revocation or discontinuance of any guaranty of the Dealer's present or future obligations to the Company; (vi) The Dealer fails to tender promptly any Goods which he becomes obligated to resell to the Company under Section 8 of this Agreement; (vii) The falsification of records, contracts, reports or any other documents which the Dealer has submitted to the Company, its affiliates or assignees; (viii) Any misrepresentation as to the direct or indirect ownership of the Dealer or as to the financial status of the Dealer, the Dealer principals or a guarantor of the Dealer's present or future obligations to the Company.

(b) If in good faith the Company is of the opinion that the debt or security is unsafe due to (i) Any dispute, disagreement or controversy between or among principals, partners, managers, officers or stockholders of the Dealer; (ii) Conviction of the Dealer principal, partner, major shareholder, or managing officer of any crime or offense; (iii) The fraudulent conduct of the Dealer; (iv) A continuing situation, sequence of events, or course of conduct by the Dealer which causes the Company to be concerned for the safety of the debt or security, which the Company has called to the attention of the Dealer and which the Dealer has failed to correct; (v) Insolvency or the filing of a bankruptcy action by or against a Guarantor.

| | |
|---|---|
| **11. RIGHTS ON DEFAULT** | The Company may take possession of Goods at any time after default and/or declare the Dealer's entire indebtedness immediately due and payable. Proceeds of the sale of Goods shall be applied first to the expense of repossession and to liquidation thereof including all reasonable attorney's fees and legal expenses, and second, to the satisfaction of the indebtedness. If after such application there are excess proceeds, the Company will pay them over as provided by law, and if there is a deficiency, the Dealer will be liable for it and shall pay it forthwith. |
| **12. BOOKS AND RECORDS** | The Dealer shall keep complete and accurate books and records of account, in a form recommended by the Company, in accordance with recognized accounting practices, including stock and sales records of Goods. The Dealer shall furnish the Company with full and complete financial and operating statements within 90 days after the end of the Dealer's fiscal year and at such other times as the Company may request. Such statements will be in a format prescribed by the Company. The Dealer shall also furnish the Company at any time upon request, full information regarding inventory on hand, inventory sold, the proceeds thereof, and any contracts or agreements affecting such inventory. The Company shall have the right at any reasonable time during the Dealer's regular business hours to inspect the Dealer's books and records, and to examine and take inventory of any Goods and proceeds in which the Company has a security interest. |
| **13. INSURANCE** | The Dealer shall continuously keep all Goods insured with all-risk type coverage satisfactory to the Company and with insurers satisfactory to the Company in an amount equal to one hundred percent (100%) of the invoice price thereof. Such insurance may be issued in the name of the Dealer who may retain possession of the policies, but each policy shall include a loss payable clause to the Company, as its interest may appear, in form satisfactory to the Company. The Dealer shall immediately furnish the Company with the name of the insurer and the number, amount, effective date and expiration date of each policy issued; and upon request of the Company shall furnish it with copies of each policy or certificate of insurance issued by the insurer. |
| **14. WARRANTY OF GOODS AND POSTDELIVERY SERVICE** | (a) The Company's published Consumer Products Dealer Service Administration Manual (hereafter called "Manual") designates John Deere new consumer products and parts and merchandise warranties applicable to sales of new Goods. The Dealer agrees to extend the designated warranties to retail purchasers in all sales of new Goods made by him and to review the warranty with the purchaser before the goods are delivered. The Dealer also agrees to use, as applicable, retail purchase orders, delivery acknowledgement forms and other forms, and to follow instructions, including instructions concerning compliance with the Federal Consumer Products Warranty Act, specified in the Manual. Where machines are rented by the Dealer, the Company's obligation under the foregoing John Deere warranties extends only to the Dealer; any obligation to the renter for the machine or its performance being that of the Dealer. |
| | The Dealer has no authority to give any warranty not designated by the Company. Where such instructions are not followed, where such forms are altered or not used in the manner prescribed, or where any other warranty is given, the Company shall have no obligation with respect to Goods and the Dealer assumes full responsibility to the customer and the Company for all claims of customers. The Company's obligation will terminate if Goods are modified or altered in ways not approved by the Company. If the Dealer made such modification or alteration, he assumes full responsibility to the customer and the Company for all claims of the customer. |
| | The Company's sole obligation to the Dealer with respect to Goods or their performance is to reimburse the Dealer for services performed in fulfilling the John Deere warranties as provided in the Manual and in this Section. THE COMPANY DISCLAIMS AND THE DEALER WAIVES ANY IMPLIED OR STATUTORY OBLIGATION, CONDITION OR WARRANTY GOING BEYOND SUCH OBLIGATION, INCLUDING IN SUCH DISCLAIMER AND WAIVER THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS. |
| | All items not included in the designated warranties, or excluded by the terms thereof, are sold to the Dealer without any warranty or obligation by the Company. |

8

(b) The Dealer will properly assemble and prepare all new Goods sold or rented by him and shall perform such inspections, adjustments and service prior to delivery to users as required in the Manual to insure proper operation of the Goods. The Dealer will instruct users in the proper use and maintenance of such Goods and will furnish each user with the appropriate operator's manual furnished by the Company. The Dealer will also perform the postdelivery inspections and adjustments prescribed in the Manual.

(c) The Dealer agrees and is authorized to perform all warranty service on new Goods and on used Goods for which the Company becomes obligated pursuant to the John Deere warranties, including Goods not sold or rented by him, if presented with proper evidence that the Goods are entitled to warranty service under the John Deere warranties. The Dealer shall also install product improvement bundles on such Goods when requested to do so by the Company. Warranty service and product improvements will be performed in the manner and for the compensation specified in the Manual in effect at the time the service is performed. The Dealer will notify the Company of all warranty claims in accordance with the Manual.

**15. PRODUCT IMPROVEMENT**

The Dealer agrees to cooperate in implementing programs and procedures to comply with the Federal Consumer Product Safety Act and to perform product improvement programs established by the Company, whether or not required by such Act.

**16. SALES TO COMPANY EMPLOYEES**

The Dealer agrees to sell Goods to employees and retirees of the Company or employees and retirees of other John Deere units affiliated with the Company, in accordance with provisions of programs established by the Company from time to time.

**17. USE OF TRADEMARKS, NAMES AND SIGNS**

The Dealer agrees not to use the names "John Deere" or "Deere" or any other trade names or trademarks owned by the Company or any of its affiliated corporations as a part of his firm, trading or corporate name, and shall not display or use such trade names or trademarks except in a form or manner approved by the Company. The Dealer further agrees that if he ceases to be an Authorized Dealer, he will remove all signs bearing such trade names and trademarks used in connection with any business conducted by him and will remove from his vehicles any distinctive John Deere vehicle identification.

**18. MAILING LIST**

The Dealer agrees to supply to the Company and keep current as to names and addresses a mailing list of prospective customers in his trade area. The Dealer should also include in his mailing list and identify names in three categories; homeowner, part-time farmer and commercial. This mailing list shall become the sole property of the Company, and the Company shall have no liability to the Dealer for any use it makes of such mailing list. The Company will furnish free of charge the "Direct Mail Broadsides" selected by the Dealer, but the Dealer agrees to reimburse the Company for handling and postage expenses for all pieces mailed to those on the mailing list. The Company shall advise the Dealer in advance of any other use it makes of such list during the Dealer's period of appointment.

**19. DEALER NOT AN AGENT**

The Dealer is not an employee, agent or representative of the Company for any purpose other than giving the Company's warranty as provided in Section 14. He has no other authority to bind the Company by any representations, statements, agreements, or in any manner whatsoever. In performing service work as provided in Section 14, the Dealer is an independent contractor and assumes full responsibility for such work.

**20. PLACE OF PERFORMANCE**

The place of performance of the Dealer's obligations hereunder shall be at the Company's address designated herein as the place of acceptance of this Agreement by the Company, and, unless a different location has been designated by the Company, all payments to the Company shall be made at its office there.

9

| | | |
|---|---|---|
| 21. | **AMENDMENT OF AGREEMENT** | This Agreement cannot be altered or amended, or any of its provisions waived, on behalf of the Company except in writing by a duly authorized officer of the Company. The Company may amend these Terms of Appointment at any time without the consent of the Dealer if the same amendment is made to the Terms of Appointment of all other Authorized Consumer Products Dealer Agreements with the Company. Any such amendment shall be effective on the date specified in a notice mailed to all Authorized Consumer Products Dealers, which date shall be at least one hundred eighty (180) days following the date of such mailing. |
| 22. | **ASSIGNMENT** | This Agreement cannot be assigned by the Dealer without prior written consent of the Company. |

JOHN DEERE AUTHORIZED CONSUMER PRODUCTS DEALER AGREEMENT

The Dealer agrees to operate only from the following authorized location:
_On Ms. Highway 33, .25 miles South of intersection with Ms. Highway 24, Centreville, Mississippi 39631_

_Richland Equipment Co., Inc._
(Dealer (Firm Name))
_Ms. Highway 33 South, Centreville, Mississippi 39631_
(Address)

✓ Corporation
— Partnership
— Proprietorship

By _[signature]_
Title _Pres_
(Authorized officer, owner or partner)

Date _1 Nov 85_

Signature of
Other Partner(s)

Received, subject to acceptance at the Company's Office in _Conyers, Ga_

JOHN DEERE COMPANY
By _J. F. Hollier_ Title _Territory Manager_

Accepted:

JOHN DEERE COMPANY    2001 Deere Drive
                     Conyers, GA   30208
                     (City)        (State)
(Address)
By _[signature]_ Title _Asst Sec_

Date _15 Jan 1986_