MS, CENTREVILLE 05 0117

# John Deere Commercial Worksite Products Dealer Agreement

RICHLAND EQUIPMENT CO INC
CENTREVILLE
MS



Received 9-5-01



EXHIBIT 3

Upon acceptance by John Deere Company - A Division of Deere & Company, hereinafter called the "Company", the undersigned Dealer is appointed a John Deere Commercial Worksite Products Dealer to merchandise those items sold by the Company as its Commercial Worksite Products line, as set forth in Schedule 1 (attached) in this agreement, including parts and attachments of the forgoing, hereafter collectively called "Goods". The Company may periodically at its discretion add product line sections to the Company Price Book or products within the sections of appointment in the Company Price Book. The Dealer is an independent retail merchant who purchases Goods for resale for the principal benefit of the Dealer.

## 1) TERMS OF APPOINTMENT

During the period of the Dealer's appointment as a John Deere Authorized Commercial Worksite Products Dealer, the parties accept the following obligations and duties:

a) Dealer Area of Primary Responsibility (APR).
The Dealer is assigned the following APR as set forth in Schedule 2 (attached) of this agreement. The assignment of an APR is an important part of determining a dealer's performance in relationship to market coverage and end user customer satisfaction as defined and measured by the Company.

The Dealer's APR may be enlarged at any time by written authorization from the Company. Upon not less than 120 days written notice to the Dealer the Company may reduce the APR of Dealer.

   i.) Company Right to Sell. Dealer is assigned Dealer's APR for the purpose of marketing, servicing, and supporting Goods. The Company or its agents may market, sale, service, and support Goods in Dealer's APR. Without limiting the right of, the Company to choose those with whom it deals, the Company may sell, loan, lease, or rent Goods, without restriction or limitation:
   (a) To federal, state and local governments.
   (b) To accounts classified by the Company as national, preferred, or direct sale accounts.
   (c) To any purchaser not able to be sold or serviced adequately by the appointed dealer as determined by the Company.
   (d) To purchasers for export.
   (e) To educational institutions and research / experimental institutions.
   (f) To its competitors (for test purposes).
   (g) To equipment manufacturers.
   (h) To its own employees.
   (i) Repossessed Goods (new & used).
   (j) Used goods repurchased by the Company.
   (k) To any customers as market changes dictate different approaches than currently in place.

   ii) The Company may re-assign any portion of Dealer's APR to other persons or entities for the purpose of marketing, renting, servicing, and supporting products. Such an assignment may include parts.

   iii) Dealer will concentrate its efforts in Dealer's APR and maintain an acceptable market share in core Products as defined by Company in Dealer's APR.

   iv) The Company shall have no obligation to support, through its programs or other forms of dealer support, activities of Dealer outside Dealer's APR, and the Company may exclude activities of Dealer outside Dealer's APR from the Company's programs and other forms of dealer support.

   v) APR Service Fee. Whenever a sale, lease, or rental of Whole Goods by Dealer is subject to the Company's APR service fee policy, as in effect from time to time, Dealer will pay a service fee in accordance with the terms of the Company's APR service fee bulletin (under separate cover) in effect when the sale, lease, or rental occurs.

John Deere Company
Commercial Worksite Products
Dealer Agreement

b) Place of Business.
The Dealer agrees to maintain his principal place of business at the location(s) as set forth on the signature page or in Schedule 3 (attached) of this agreement.

   i.) Dealer will not open any new Dealer location, relocate or discontinue a dealer location, or change the purpose of the dealer location without obtaining the Company's prior written approval. Dealer will not either directly or indirectly, establish, maintain, or operate at any other location a place of business of any kind (or from which) any Goods are displayed, sold, leased, rented, or serviced.

   ii.) Dealer will separate, in a manner acceptable to Company, other business activities and/or product lines from Dealer's John Deere dealership operations if, in the Company's sole discretion, such activities and/or product lines are likely to detract from Dealer's representation of Goods. At Companies sole discretion this may require that Dealer provide to the Company an acceptable exit plan for competitive equipment where Dealer will not sell, lease, rent, demonstrate, or display parts or whole goods that compete with Goods.

c) Order Acceptance.
The Company agrees to accept orders placed by the Dealer for Goods, which the Company contemplates, will be shipped during the period of Dealer's appointment as a Commercial Worksite Products Dealer. The Company will have no liability for delay, failure, or refusal to accept Dealer's orders or to ship Goods to Dealer if the delay, failure, or refusal results from:

   i) capacity constraints, demand in excess of available supply, labor strikes or lockouts;

   ii) a default under a security agreement between Dealer and the Company;

   iii) termination of Dealer's appointment;

   iv) any cause beyond the Company's control; or

   v) the Company's determination, in its sole discretion, that:

      a) Dealer's financial condition does not justify the extension of additional credit or the addition of inventory;

      b) Limitations in Dealer's market potential, marketing capabilities, product support capabilities or not in relation to Dealer's retail sales history of Goods; or

      c) the particular Goods involved are likely to lead to customer dissatisfaction with the Goods or excessive warranty expense;

      d) Dealer has consistently failed to perform its obligations under this Agreement;

      e) Dealer's inventory of Goods is excessive or with additional shipments would become excessive, or shipment would result in larger Dealer inventories than the Company is willing to finance; or

      f) Shipment would result in larger Dealer inventories than warranted based on expected market demand.

All orders, sales, and shipments will be governed by the Conditions of Sale (see Section 2) in effect at the time the order is shipped.

d) Availability of Program. The Company agrees that the Dealer will have the benefit of any Finance Plans, Lease Plans, Floor Plans, Parts Return Programs, Sales or Incentive Programs or similar plans or programs which it makes available from time to time to other Authorized Commercial Worksite Products Dealers. Such plans or programs may contain standards, conditions or requirements of uniform application, which the Dealer must meet in order to, use or benefit from them. State or local laws or regulations may require variations from standard plans or programs.

John Deere Company
Commercial Worksite Products
Dealer Agreement

e) Sales and Marketing Promotion.
The Company relies on Dealer to aggressively promote the sale, lease, demonstration and rental of Goods in Dealer's APR and to provide a level of service and support of Goods that meets customer's needs and expectations. The Dealer agrees to use vigorous and continuously active efforts to promote, sell, and service Goods. The dealer further agrees to achieve sales objectives, market penetration and customer satisfaction with in the Dealer's Area of Primary Responsibility satisfactory to the Company and will maintain:

i) A modern place of business approved by the Company, with adequate space and facilities devoted to the sales, service, display and storage of Goods, with appropriate identification for a Dealer Selling Goods. The facility shall be consistent with the image required for selling quality commercial and industrial equipment.

ii) Competent management and a sufficient staff of well-trained personnel devoted to the sale and service of Goods, carrying out obligations under this Agreement and will cooperate with the Company by sending such personnel, at Dealer expense, to conferences and training schools provided by the Company.

iii) Adequate equity and working capital to meet all payment obligations, sales growth initiatives presented by the Company, and obligations under this Agreement.

iv) Sufficient levels and maintenance of inventories (Goods) in proportion to market sale and support potential as defined by the Company.

v) Service equipment, stock of service parts and special tools necessary to promptly fulfill the warranty obligations of both the Dealer and the company, product improvement programs and non-warranty service needs of users of Goods in his Area of Primary Responsibility, whether or not the Goods were sold by Dealer.

f) Preparation of Goods, Warranty, and Post-Delivery Service

i) Manuals, and/or bulletins issued from time to time by the Company designate Company Warranties governing Goods related to this appointment. In making sales, leases, and rentals of Goods, Dealer will follow instructions contained in these Manual along with Company bulletins and will complete with true and accurate information the retail purchase orders, delivery receipts, lease agreements, and other forms specified therein. Dealer will be solely responsible for any warranties given by Dealer that exceed the applicable expressed Warranty, if any, and for any liability in cases where Dealer has failed to use the forms and the Goods instructions as prescribed by the Company in the manner specified by the Company.

ii) To ensure the proper operation of Goods, Dealer will properly assemble and prepare all Goods sold, leased, or rented by Dealer and will perform such inspections, adjustments, and service prior to delivery to users as are required in the Manual. Dealer will instruct users in the proper and safe use and maintenance of Goods and will furnish each user with the appropriate operator's manuals furnished by the Company. Dealer will also perform the post-delivery inspections and adjustments prescribed for Goods in the Manual.

John Deere Company
Commercial Worksite Products
Dealer Agreement

    iii) Dealer is authorized and will perform prompt and effective warranty service on Goods which Company becomes obligated pursuant to a John Deere Company or John Deere Private Labeled Product Warranty, including without limitation Goods not sold, leased, or rented by Dealer, if presented with proper evidence that the Goods are entitled to warranty service under a John Deere Company or John Deere Private Labeled Product Warranty.

    iv) Dealer will perform prompt and effective non-warranty service on Goods, including without limitation Goods not sold, leased, or rented by Dealer.

    v) Dealer will perform product improvement programs that the Company may from time to time require for Goods, including Goods not sold, leased, or rented by Dealer. Dealer will complete such programs as expeditiously as possible and, in any event, within the time frame specified by the Company.

    vi) Dealer will perform warranty service and product improvement programs in the manner and for the compensation specified in the Manual or by bulletin in effect at the time the service or program is performed. Dealer will notify the Company of all warranty and product improvement program claims in accordance with the Manual or bulletin.

f) Periodic Reviews.
In order to ensure that a satisfactory level of Dealer performance is obtained, the Dealer agrees to cooperate with the Company in periodic reviews of the performance of his obligations under this Agreement. Upon request from the Company, the Dealer will submit and secure the Company's approval of a business plan covering one or, if requested by the Company, more years, and containing, but not limited to, for each year covered by the plan:

    i) an objective for market growth, market share, customer satisfaction, equity and other criteria (performance) specified that represents meaningful progress and achievement for the performance criteria established

    ii) action plans to achieve the performance criteria and volume objectives specified in the plan and, within a reasonable period of time,

    iii) such other elements as the Company may request of Dealers generally.

g) Sales to Re-sellers
Dealer will not sell Goods to any person or entity that re-sells or intends to re-sell such Goods, provided, however, that this Section shall not prevent Dealer from:

    i) selling Parts to a person or entity in Dealer's APR that uses such Parts in providing repair or maintenance services in Dealer's APR for products owned by others;

    ii) selling Used Goods to a person or entity that is engaged in the business of selling used equipment;

    iii) selling Goods to another John Deere Dealer; or

    iv) selling Goods to a person or entity that is primarily engaged in the business of renting equipment to end users.

## 2) CONDITIONS OF SALE

Orders for Goods placed by the Dealer and accepted by the Company will be governed by the following conditions of sale, whether or not such orders are placed or filled after the cancellation or termination of the period of appointment.

John Deere Company
Commercial Worksite Products
Dealer Agreement

a) Title to Goods. Title to and ownership of Goods and risk of loss shall pass to the Dealer upon delivery to a carrier (including agents or employees of the Dealer).

b) Shipment. Dealer requests for manner of shipment ordinarily are adhered to unless the Dealer's request appears to be impractical under the circumstances. If Goods are to be called for by the Dealer on or before a specified date and are not called for on or before such date, the Company in any manner considered advisable may ship them.

c) Shortages. All Claims that the Company shipped the Goods short must be made by the Dealer in writing as specified in Dealer Bulletins from time to time after receipt of the shipment in question.

d) Design Changes. The Company has no obligation to furnish the dealers with changes in the design or construction of Goods previously shipped despite incorporation of such changes in current shipments.

e) Prices and terms. Unless otherwise provided in a bulletin issued by the Company, prices and terms of payment on all Goods shall be the Company's published dealer prices and terms in effect on the date of shipment. Such published prices and terms may be changed by the Company at any time, and dealers will be notified of such changes, but any such change will become effective on the date indicated whether or not the Dealer has actually received notice thereof.

f) Substitution of New Model Machines. If particular model of machine (Goods) ordered is no longer available and has been replaced by a new model, the Company may, upon authorization by the Dealer, substitute the new model machine, and the price and terms shall be those applicable to the new model machine. If the Dealer does not authorize the substitution, the Dealer's order will be canceled.

g) Payment. The Dealer shall promptly pay the Company at the place and in the manner designated by the Company, for all Goods and other charges connected with the shipment as provided in the Company's published Dealers Terms Schedule. All Payments shall be made in cash expect when otherwise provided in Finance Plans, Lease Plans, Floor Plans, or other plans, programs or bulletins issued to the Dealer by the Company.

3) CANCELLATION

The Company may cancel the Dealer's appointment at any time after the happening of any of the following:

a) Death of an individual proprietor, partner, major shareholder, or the manager of the dealership,

b) Withdrawal of an individual proprietor, partner, major shareholder, or the manager of the dealership, without the prior written consent of the Company:

c) Default (see Section 10, Default)

d) A Change without the prior written approval of the Company, in the location of the Dealer's principal place of business under this Agreement.

e) Revocation or discontinuance of any guaranty of the Dealer's present or future obligations to the Company.

f) Termination (or notice of termination) of any John Deere Dealer Agreement that the dealer, or an affiliate company, has with the Company.

John Deere Company
Commercial Worksite Products
Dealer Agreement

### 4) TERMINATION ON SPECIFIED DATE

Unless the Dealer's appointment is canceled under Section 3, it shall continue until it is terminated by one or both of the parties as provided in this Section 4. The Dealer's appointment may be terminated at any time:

a) By the mutual written consent of the parties, with the effective date of such termination to be such as may be mutually agreed upon; or

b) By written notice given by the Company to the Dealer at least one hundred eighty (180) days prior to the effective date specified in such notice if the Company determines that the Dealer's trade area does not afford sufficient sales potential to continue to reasonably support an authorized dealer or if the Company believes the Dealer is not fulfilling the requirements of his appointment despite the opportunity to correct or to take appropriate action toward correcting deficiencies in his operations which have been called to his attention by the Company; or

c) By written notice give by the Dealer to the Company at least one hundred eighty (180) days prior to the effective date specified in such notice; or

d) By the execution of a new Authorized Dealer Agreement between the parties which is intended to supersede this Agreement or by the Dealer's failure to execute a new Authorized Dealer Agreement within 30 days after it has been offered by the Company.

e) The Company may, after an effective date of termination is established, negotiate or enter into a Dealer Agreement with another party for the Dealer's APR.

### 5) EFFECT OF CANCELLATION OR TERMINATION OF APPOINTMENT

After the Dealer's appointment is canceled under the provisions of Section 3, or after the effective date of termination under Section 4, either party may discontinue doing business with the other at any time, subject only to the rights and duties set forth herein. After such time, either party may cancel unfilled orders. Submission or acceptance of orders after the period of appointment does not constitute agreement by either party to an extension of the period of appointment. Except as provided herein, neither party is entitled to any compensation or reimbursement for loss of prospective profits, anticipated sales or other losses occasioned by cancellation or termination. Cancellation or termination does not affect the obligations of either party with respect to Goods already delivered to the Dealer or any security for such obligations.

### 6) DEATH OF DEALER: COOPERATION WITH SURVIVORS

If the Dealer's appointment is canceled because of the death of one of the persons enumerated in Section 3 a), it is agreed:

a) That if the heirs (hereafter called "Successors") wish to continue operating the Dealership, the Company will cooperate with them in their effort to arrange to do so, provided that shipments will be made only if the Company is satisfied that the Successors are bound by this Agreement. The Company at its sole discretion may offer to execute a Dealer Agreement with the Successors if it believes them to be capable of carrying out the obligations thereunder.

b) That The Company shall have discharged its obligations under subsection (a) under any of the following Condition:

    i) The Company informs the successors in writing that it will not execute a New Dealer Agreement and 180 days shall have elapsed since such death.

John Deere Company
Commercial Worksite Products
Dealer Agreement

    ii) The Company receives written notification that the Successors do not wish to enter into a new Dealer Agreement.

    iii) The Successors cannot agree on appropriate arrangements for carrying on the business.

    iv) Any of the events enumerated in Subsections (c) through (f) of Section 3 has occurred or shall occur.

## 7) REPURCHASE OF GOODS

If any of the following events occur, the Company agrees to buy and the Dealer agrees to sell Goods as provided in Section 8.

a) The Dealer's appointment is canceled under Section 3 (and in the case of cancellation because of death of one of the persons enumerated in Section 3(a), one of the conditions enumerated in Section 6(b) has occurred).

b) The Dealer's appointment is terminated under Section 4(a), 4(b) or 4(c); or

c) The Dealer has not executed a new Authorized Dealer Agreement within 30 days after the Company has offered it.

The Company shall be relieved of this obligation if a default occurs or has occurred under this Agreement or under this Agreement or under any Chattel Mortgage or Security Agreement between the Company and the Dealer, and the company elects to exercise its rights under such Agreement, Chattel Mortgage or Security Agreement to take possession of Goods.

## 8) TERMS OF REPURCHASE

Except where otherwise provided by the laws of the state where the Dealer is located, if the Company becomes obligated to repurchase Goods under Section 7, then the Company will buy and the Dealer will sell (or may sell subject to Subsection c)) free and clear of all liens and encumbrances, the following Goods, provided they were either originally purchased by the Dealer from the Company, or purchased from other Dealers with the written approval of the Company and are listed in the Company's published price list for that category of Goods, in effect on the effective date of cancellation or termination of the Dealer's appointment.

a) All current complete machines and attachments in the Dealer's possession unsold (which category excludes all items listed in the JDM Price List or John Deere Parts Price List) which are new, unused, complete and in good condition. The prices to be paid for such items will be the invoice prices (but not more than current dealer prices), plus freight from the factory to the Dealer's location at truckload (24,000#) rates for items on which freight was paid by the Dealer, less any discounts from invoice price which have been allowed and less the reduction in value, if any, resulting from deterioration.

b) All current parts in the Dealer's possession unsold which are new, unused, in good condition and are re-sellable as new parts without repackaging or reconditioning. The prices to be paid for such items will be the current wholesale price as listed in the John Deere Parts Price List, less a discount of:

    i)     15% on items listed as returnable under the Company's parts return policy; and

    ii)     50% on all other items.

John Deere Company
Commercial Worksite Products
Dealer Agreement

    c) All current JDM products in the Dealer's possession unsold which the Dealer may elect to sell to the Company and which are new, unused, in good condition and are re-sellable as new products without repackaging or reconditioning. The Company shall have no obligation to repurchase such products unless the Dealer furnishes the Company with a list of the products, which he wishes to sell to the Company within thirty (30) days after the effective date of cancellation or termination of his appointment. The price to be paid for such products will be the current wholesale price listed in the JDM Prices List less a discount of:

        i)     50% on products identified by an asterisk (*);

        ii)    15% on items listed as returnable under the Company's parts return policy; and

        iii)   25% on all other JDM products.

At the written request of the Company, the Dealer will list, tag, pack, load and transport all repurchased Goods to the nearest location regularly maintained by the Company for storage of such Goods or to such closer location as may be designated by the Company or pay for the cost of transportation to such location. The risk of loss shall be on the Dealer until the vehicle transporting such Goods reaches the designated destination. Should the Dealer fail to fulfill the above obligation within sixty (60) days after he has been requested to do so, the Company may enter the Dealer's premises, perform these duties and charge the Dealer's account for any expenses incurred in so doing.

The Company may pay for repurchased Goods in cash or by giving the dealer credit to be applied to any indebtedness then owed by the Dealer to the Company or to any other company having a corporate affiliation with the Company whether or not such indebtedness is then due and payable. If there is still a balance owing by the Dealer after the price of the repurchased Goods, less any Company incurred expenses of recovery, including reasonable attorney's fees and legal expenses, has been credited to the Dealer, such balance shall be immediately due and payable to the Company regardless of the original terms of payment thereon.

## 9) RESOLUTION OF DISPUTES

Although Dealer and John Deere are entering into this Agreement in a spirit of cooperation and mutual respect, it is possible that disputes may arise. Dealer, Affiliates (including without limitation guarantors of Dealer), Deere & Company and it's affiliates agree that any dispute shall be finally resolved by binding arbitration pursuant to the terms set forth in Schedule 4. The duty to arbitrate shall extend to any officer, employee, shareholder, principal, agent, partner, trustee (in bankruptcy or otherwise), or subsidiary of Dealer or an Affiliate as to any dispute that is subject to this Section 9 regardless of allegations against any third party.

## 10) SECURITY

Security Agreements or Mortgages given to the company by Dealer's who handle other John Deere products apply to Goods also. However, if the Dealer does not handle other John Deere products or if no other instrument provides the company with a security interest in Goods, the following provisions apply and are not affected by the cancellation or termination of the Dealer's appointment hereunder: To secure all indebtedness to the Company, the Dealer hereby grants to the Company a security interest in his inventory of Goods as it may from time to time be constituted, located either at the address herein set forth or at any other location used by the Dealer for storing Goods, in transit, or on rental or demonstration. Such security interest shall also include additions or replacements to the dealer's present stock and shall also extend to all proceeds (as defined in the Uniform Commercial Code.) of the sale or rental of such inventory and to all insurance proceeds of such inventory.

John Deere Company
Commercial Worksite Products
Dealer Agreement

Goods may be sold in the ordinary course of business, but the dealer will not otherwise sell, encumber or deal with them. The Dealer will store Goods in a place and manner to adequately protect their value from deterioration at the address set forth herein or at any other storage location approved in writing by the Company at his expense and risk of loss, and will pay when due all taxes, license fees or other charges against them or on the sale thereof. All Goods secure the entire indebtedness of the Dealer to the Company, and each item remains security for such indebtedness even if its own purchase price is paid.

To further secure his indebtedness to the Company, the Dealer hereby:

a) Assigns to the Company any and all accounts or contracts, including rights to insurance proceeds of all inventory described in this Section 9, owed to him by other companies having a corporate affiliation with the Company; and

b) Grants to the Company a security interest in his reserve accounts and contingent earnings accounts, as described in the John Deere Lawn and Garden Dealer and Commercial Products Dealer Finance Agreement and in the John Deere Lawn & Grounds Care Leasing Agreement with Deere Credit, Inc.

c) The Dealer will execute such additional security agreements, chattel mortgages financing statements and the like, and amendments and additions thereto or to existing instruments, as the Company requests, in order that the Company may have at all times a first lien of Goods securing the Dealer's indebtedness to the Company.

## 11) DEFAULT

a) The following shall constitute events of default by the Dealer:

i) The Dealer defaults in the payment or performance of any obligation to the Company;
ii) The Dealer, in violation of Section 9 hereof, sells or disposes of Goods or proceeds, including trade-ins, or allows any lien or encumbrance to be created or remain thereon;
iii) The Dealer (or any member of the Dealer's firm if a partnership) becomes insolvent, makes an assignment for the benefit of creditors, institutes or has instituted against him proceedings under any bankruptcy or insolvency law, or the Dealer has his stock in trade or any part thereof levied upon or attached;
iv) Closeout or sale of a substantial part of the Dealer's business related to the handling of Goods, or commencement of dissolution or liquidation of the Dealer if a partnership or corporation;
v) Revocation or discontinuance of any guaranty of the Dealer's present or future obligations to the Company;
vi) The Dealer Fails to tender promptly any Goods which he becomes obligated to resell to the company under Section 8 of this Agreement;
vii) The falsification of records, contracts reports or any other documents which the Dealer has submitted to the Company, its affiliates or assignees;
viii) Any misrepresentation as to the direct or indirect ownership of the Dealer or as to the financial status of the Dealer, the Dealer principals or a guarantor of the Dealer's present or future obligations to the Company;
ix) The removal of Goods, which have never been and are not being rented, leased or sold at retail, from the Dealer's regular place of business or Company-approved storage location (except for the purpose of a Company-approved demonstration), or the personal use of such Goods by the Dealer.

b) If in good faith the Company is of the opinion that the debtor or security is unsafe due to

i) Any dispute, disagreement or controversy between or among principals, partners, managers, officers or stockholders of the Dealer;
ii) Conviction of the Dealer principal, partner, major shareholder, or managing officer of any crime or offense;
iii) The fraudulent conduct of the Dealer;

John Deere Company
Commercial Worksite Products
Dealer Agreement

    iv) A continuing situation, sequence of events, or course of conduct by the Dealer which causes the company to be concerned for the safety of the debt or security, which the Company has called to the attention of the Dealer and which the Dealer has failed to correct;

    v) Insolvency or the filing of a bankruptcy action by or against a Guarantor.

## 12) RIGHTS ON DEFAULT

The company may take possession of Goods at any time after default and/or declare any or all of the Dealer's indebtedness immediately due and payable, except that, any indebtedness which does not have a fixed maturity date and which is for Goods which have never been rented, leased or sold at retail, may be declared due and payable only after the Goods subject to such indebtedness have been disposed of in a commercially reasonable manner which involves the sale of the Goods. Proceeds of the sale of Goods shall be applied first to the expense of repossession and to liquidation thereof, including all reasonable attorney's fees and legal expenses, and second, to the satisfaction of the indebtedness. If, after such application, there are excess proceeds, the Company will pay them over as provided by law, and, if there is a deficiency, the Dealer will be liable for it and shall pay it forthwith.

## 13) BOOKS AND RECORDS

The Dealer shall keep complete and accurate books and records of account, in a form recommended by the Company, in accordance with recognized accounting practices, including stock and sales records of Goods. The Dealer shall furnish the Company with full and complete financial and operating statements within 90 days after the end of the Dealer's fiscal year and at such other times as the Company may request. Such statements will be in a format prescribed by the Company. The Dealer shall also furnish the Company at any time upon request, full information regarding inventory on hand, inventory sold, the proceeds thereof, and any contracts or agreements affecting such inventory. The Company shall have the right at any reasonable time during the Dealer's regular business hours to inspect the Dealer's books and records, and to examine and take inventory of any Goods and proceeds in which the Company has a security interest.

## 14) INSURANCE

The Dealer shall continuously keep all Goods insured with all-risk type coverage satisfactory to the Company and with insurers satisfactory to the Company and in an amount equal to one hundred percent (100%) of the invoice price of Goods or other amount satisfactory and in writing to the Company. Such insurance may be issued in the name of the Dealer who may retain possession of the policies, but each policy shall include a loss payable clause to the Company, as its interest may appear, in form satisfactory to the Company. The Dealer shall immediately furnish the Company with the name of the insurer, the number, amount, effective date and expiration date of each policy issued, and upon request of the Company shall furnish it with copies of each policy or certificate of insurance issued by the insurer.

## 15) WARRANTY

The Company's sole obligation to the Dealer with respect to Goods or their performance is to reimburse the dealer for services performed in fulfilling the John Deere warranties as provided in the Manual and in this Section. **THE COMPANY DISCLAIMS AND THE DEALER WAIVES ANY IMPLIED OR STATUTORY OBLIGATION, CONDITION OR WARRANTY GOING BEYOND SUCH OBLIGATION, INCLUDING IN SUCH DISCLAIMER AND WAIVER THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS.** Modifications or alterations to Goods not approved by the Company will terminate warranty obligations by the Company and Dealer assumes full responsibility to the customer and the Company for all claims against those Goods.

All items not included in the designated warranties, or excluded by the terms thereof, are sold to the Dealer without any warranty or obligation by the Company.

John Deere Company
Commercial Worksite Products
Dealer Agreement

### 16) PRODUCT IMPROVEMENT

The Dealer agrees to cooperate in implementing programs and procedures to comply with the Federal Consumer Products Safety Act and to perform product improvement programs established by the Company whether or not required by such Act.

### 17) SALES TO COMPANY EMPLOYEES

The Dealer agrees to sell Goods to employees and retirees of the company or employees and retirees of other John Deere units affiliated with the Company, as authorized and in accordance with provisions of programs established by the Company from time to time.

### 18) USE OF TRADEMARKS, NAMES AND SIGNS

The Dealer agrees not to use the names "John Deere" or "Deere" or any other trade names or trademarks owned by the Company or any of its affiliated corporations as a part of his firm, trading or corporate name, and shall not display or use such trade names or trademarks except in a form or manner approved by the Company. The Dealer further agrees that if his appointed is terminated as an Authorized Dealer, he will remove all signs bearing such trade names and trademarks used in connection with any business conducted by him and will remove from his vehicles any distinctive John Deere vehicle identification. In all cases where the Dealer operates a web site on the Internet and represent themselves as a John Deere Dealer on such to the public, the Dealer will include in their web site a link back to the Company's web site.

### 19) MAILING LIST

The Dealer agrees to maintain a customer list and provide it to the Company. This customer list shall become the sole property of the Company. The company shall advise the Dealer in advance of any other use it makes of such list during the Dealer's period of appointment.

### 20) USE OF PRICE LISTS, CATALOGS, AND MANUALS

It is understood and agreed that price lists, catalogs and service manual pages furnished to the Dealer, in either printed or electronic form, remain the property of the Company and are merely loaned to the Dealer. The Dealer will keep them in good condition and will return them to the Company at its request.

### 21) ELECTRONIC DATA SYSTEMS

The Dealer agrees to utilize all electronic data systems made available by the Company to facilitate mutually efficient operations and communications between the Dealer and the Company.

### 22) DEALER NOT AN AGENT

The Dealer is not an employee, agent or representative of the Company for any purpose other than giving the Company's warranty as provided in Section 14. He has no other authority to bind the Company by any representations, statements, agreements or in any manner whatsoever. In performing service work as provided in Sections 14, the Dealer is an independent contractor and assumes full responsibility for such work.

John Deere Company
Commercial Worksite Products
Dealer Agreement

### 23) PLACE OF PERFORMANCE

The place of performance of the Dealer's obligations hereunder shall be at the Company's address designated herein as the place of acceptance of this agreement by the Company, and, unless a different location has been designated by the Company, all payments to the Company shall be made at the place designated from time to time.

### 24) METHOD OF GIVING NOTICE

Without limitation on any other method of giving notice, the deposit of written notice in the United States mails in an envelope certified or registered with postage prepaid and addressed to the Dealer, at the address shown herein, or to the Company, at the office designated herein, shall constitute notice pursuant to this Agreement.

### 25) AMENDMENT OF AGREEMENT

This Agreement cannot be altered or amended, or any of its provisions waived, on behalf of the company except in writing by a duly authorized officer of the Company. The Company may amend these Terms of Appointment at any time without the consent of the Dealer if the same amendment is made to the Terms of Appointment of all other Authorized Commercial Worksite Products Dealer Agreements with the Company. Any such amendment shall be effective on the date specified in a notice mailed to all Authorized Commercial Worksite Products Dealers, which date shall be at least one hundred eighty (180) days following the date of such mailing.

### 26) ASSIGNMENT

This Agreement cannot be assigned by the Dealer without prior written consent of the Company.

### 27) GOVERNING LAW

This Agreement shall be governed by and construed in accordance with the substantive laws of the State of North Carolina without regard to North Carolina's conflict of law rules.

### 28) PROMISES AND REPRESENTATIONS

Dealer and John Deere agree that the following are the only promises, agreements, or representations, oral, written, or created through custom, usage, or course of dealing, not contained elsewhere in this Agreement and that were an inducement to or relied upon by any party hereto in entering into this Agreement or that were made prior to or contemporaneous with this Agreement and are not superseded by this Agreement.

John Deere Company
Commercial Worksite Products
Dealer Agreement

## SCHEDULE 1

## APPOINTMENT

JOHN DEERE COMMERCIAL WORKSITE PRODUCTS GOODS AS SET FORTH

   A.) IN JOHN DEERE COMMERCIAL WORKSITE PRODUCTS PRICE LIST*

   B.) PARTS IN JOHN DEERE PARTS PRICE LIST

   C.) BUNDLES AND ATTACHMENTS IN JOHN DEEERE COMMERCIAL WORKSITE PRODUCTS PRICE LIST

*The Company may periodically at its discretion add product line sections to the Company Price Book or products within the sections of appointment in the Company Price Book.

John Deere Company
Commercial Worksite Products
Dealer Agreement

## SCHEDULE 2

## DEALER'S APR

MS, CENTREVILLE 05 0117

**Dealer's Area of Primary Responsibility shall consist of the following counties:**

IN THE STATE OF MISSISSIPPI:
WILKINSON

John Deere Company
Commercial Worksite Products
Dealer Agreement

## SCHEDULE 3
## LOCATIONS AUTHORIZED

MS, CENTREVILLE 05 0117

<u>Address</u>

HIGHWAY 33 SOUTH   CENTREVILLE   MS  396310518

John Deere Company
Commercial Worksite Products
Dealer Agreement

## SCHEDULE 4

# DISPUTE RESOLUTION

1. If the parties to a dispute agree, the dispute will be submitted to non-binding mediation.

2. If the parties to a dispute do not agree to mediation of the dispute, or if mediation does not resolve the dispute, the dispute shall be finally resolved by binding arbitration in accordance with the arbitration rules of JAMS/Endispute, as amended by this Schedule. The party seeking arbitration shall submit a written notice of arbitration to the other party and to JAMS/Endispute. The arbitration shall be held at such location as required by applicable law or, if no location is required by applicable law, at Raleigh, North Carolina, Knoxville, Tennessee or such other city as the parties to the dispute may agree in writing. The arbitration shall be held before a panel of three arbitrators each of who is affiliated with JAMS/Endispute and is part of the pool of arbitrators selected by JAMS/Endispute as available to arbitrate disputes. Each arbitrator in the pool shall:

    a) be a current or former practicing attorney or former judge;

    b) have at least fifteen years experience in litigation, arbitration, and/or mediation of commercial disputes;

    c) have prior experience as an arbitrator (through award) of at least thee manufacturer/dealer or franchiser/franchisee disputes; and

    d) be recommended as a commercial arbitrator by at least two major manufacturers or franchisers and at least two dealers or franchisees.

    The arbitration panel shall consist of one arbitrator from the pool designated by Dealer, one arbitrator from the pool designated by John Deere, and a third arbitrator from the pool designated by the two other arbitrators, which person shall be the Chairperson of the arbitration panel. A decision and award joined by at least two members of the arbitration panel shall constitute the award and shall be binding on the parties. The arbitration panel shall provide written reasons for their decision and award, which shall be final and binding and may be entered by any court having jurisdiction thereof.

3. Except as provided herein, any action or decision joined by two arbitrators from the arbitration panel shall constitute the action of the arbitration panel. The arbitration panel may consider and grant dispositive motions, including without limitation motions to dismiss or for summary judgment. In order to prevent irreparable harm, the arbitration panel may consider and grant requests for temporary or permanent injunctive relief or other equitable relief.

4. Unless contrary to applicable law, this Agreement shall be interpreted in accordance with and the arbitrator shall apply and be bound to follow the substantive laws of the State of North Carolina. Where there is a conflict between the terms of this Agreement and the laws of the State of North Carolina, the terms of this Agreement shall control.

5. Each party shall bear its costs associated with the arbitration, including its attorneys' fees, and the parties shall share equally the fees and expenses of JAMS/Endispute and the arbitrator's, provided, however, that if court proceedings to stay litigation, compel arbitration, or enforce the award are necessary, the party who unsuccessfully opposes such proceedings shall pay all associated costs, expenses, and attorneys' fees that are reasonably incurred by the other party.

6. The Chairperson of the arbitration panel shall decide all matters relating to discovery as well as all procedural or nondispositive matters that shall come before the arbitration panel. Subject to privileges recognized under applicable law, the Chairperson shall require such discovery as is necessary for the parties to be adequately prepared for the arbitration. Discovery may include the exchange of documents, depositions, interrogatories, and the exchanges of Schedules, expert reports, and witness lists.

John Deere Company
Commercial Worksite Products
Dealer Agreement

7. The parties, witnesses, and arbitrator shall not disclose the contents or results of the arbitration without the prior written consent of all parties to the dispute, except to the extent necessary to enforce the award or as necessary for financial and tax reporting purposes.

8. Notwithstanding anything to the contrary in this Schedule 4 or Section 9, in the event of an alleged violation of a party's intellectual property rights, that party may seek temporary injunctive relief from any court of competent jurisdiction pending appointment of the arbitration panel. The party requesting such relief shall also promptly file a notice of arbitration and a request that the arbitration panel provides temporary relief. Such actions shall not constitute a waiver of the party's rights or a breach of the party's obligations under this Schedule 4 and Section 9. Any temporary injunctive relief entered by a court shall continue in effect only until the arbitration panel has issued a decision on temporary relief.

9. Notwithstanding anything to the contrary in this Schedule 4 or Section 9, John Deere and Deere Credit, Inc. may seek judicial remedies, such as (but not limited to) attachment, replevin, and garnishment, deemed necessary by John Deere or Deere Credit, Inc. in its sole discretion for the enforcement of John Deere's or Deere Credit, Inc.'s rights regarding any security for indebtedness of Dealer, and such action by John Deere or Deere Credit, Inc. shall not constitute a waiver of John Deere's or Deere Credit, Inc.'s rights or a breach of John Deere's or Deere Credit, Inc.'s obligations under this Schedule 4 and Section 9.

John Deere Company
Commercial Worksite Products
Dealer Agreement

MS, CENTREVILLE 05 0117

JOHN DEERE AUTHORIZED COMMERCIAL WORKSITE PRODUCTS DEALER AGREEMENT

HIGHWAY 33 SOUTH, CENTREVILLE, MS 396310518
Address of Dealer
RICHLAND EQUIPMENT CO INC
Dealer (Firm Name)

X Corporation   By: _____
__ Partnership
__ LLC
__ Proprietorship   Title: _____President_____
(Authorized officer, partner or owner)

Date  3-23-01

Signature of Other Partner(s) _____

Accepted

JOHN DEERE COMMERCIAL WORKITE PRODUCTS, INC
9600 Corporate Park Drive
Loudon, TN 37930
By _____   Title: Manager, North America Sales
Date 20 APR 01

JOHN DEERE COMPANY - A DIVISION OF DEERE & COMPANY
4401 Bland Road
Raleigh, North Carolina 27609
By _____   Title _Credit Manager_
Date 7-19-01

Page 19 of 19